UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SNOQUALMIE INDIAN TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SNOQUALMIE, et al.,<br><br>Defendants. | CASE NO. C15-1936JLR<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |

## I. INTRODUCTION

Before the court is Defendants City of Snoqualmie ("the City"), Mayor Matthew Larson, City Councilman Robert Jeans, City Councilwoman Chelley Patterson, City Councilman Bryan Holloway, City Councilwoman Heather Munden, City Councilman Charles Peterson, City Councilwoman and Mayor Pro Tem Kathi Prewitt, City Administrator Robert Larson, City Public Works Director Daniel Marcinko, and John Doe Council Member's motion to dismiss Plaintiff Snoqualmie Indian Tribe's ("the Tribe") amended complaint. (Mot. (Dkt. # 22); *see also* Resp. (Dkt. # 24); Reply (Dkt.

ORDER- 1

# 27); Am. Compl. (Dkt. # 15).) Defendants argue that the court should dismiss the Tribe's 42 U.S.C. § 1981 claim as not plausibly pleaded and decline to exercise supplemental jurisdiction over the Tribe's remaining state law claims. (*See* Mot. at 1-2.) The Tribe opposes Defendants' motion. (*See* Resp.) The court has considered the motion, all submissions filed in support of and opposition to it, the appropriate portions of the record, and the relevant law. Being fully advised,[1] the court GRANTS in part and DENIES in part Defendants' motion as set forth below.

## II.   BACKGROUND

This case arises out of a dispute regarding municipal services that the City provides to the Tribe and, more specifically, to the casino that the Tribe operates ("the Casino"). The Casino is located outside City limits but within the City's urban growth area ("UGA"). (*See* Am. Compl. ¶¶ 2, 51.) The City provides sewer and other municipal services pursuant to the "Agreement Between the City of Snoqualmie and the Snoqualmie Tribe for the Provision of Police, Fire and Emergency Medical Services to the Snoqualmie Hills Project and Sewer Utility Service to the Tribe's Initial Reservation" ("the Agreement") that the Tribe and the City entered into on April 26, 2004. (*See id.* ¶¶ 32, 43.) The stated term of the Agreement is seven years after the opening of the Casino, after which the Agreement automatically renews for five additional periods of seven years unless either the Tribe or the City gives written notice of termination at least

---

[1] No party has requested oral argument, and the court deems it unnecessary to the disposition of this motion. *See* Local Rules W.D. Wash. LCR 7(b)(4).

six months prior to the expiration of the initial term or any renewal term.  (*Id.* ¶ 40; Agreement (Dkt. # 18-1) ¶ 2.19.)

The Casino opened in November 2008.  (Am. Compl. ¶ 40.)  It employs approximately 1,200 individuals and serves an average of 6,000 to 7,000 patrons per day.  (*Id.* ¶¶ 26-27.)  Under the Agreement, the City agreed to accept up to 360 equivalent residential units ("ERU")[2] of wastewater effluent per day.  (*See id.* ¶ 37; Agreement ¶ 2.6.)  The Tribe paid the City approximately $1,270,440.00 for sewer capacity at the time of connection, and approximately $3,000,000.00 for sewer services from 2008 through 2015.  (Am. Compl. ¶¶ 38, 54.)  "At all times relevant, the City has provided uninterrupted sewer services to the Casino . . . and the Tribe has paid each bill from the City for such services in full."  (*Id.* ¶ 43.)

In June 2014, the City enacted Ordinance 1133, which raised sewer rates for all customers outside City limits to 150% of the rates for those inside City limits effective July 1, 2014.  (*Id.* ¶ 48; *see* Sterbank Decl. (Dkt. # 23) ¶ 2, Ex. A ("Ord. 1133") § 2.)  Prior to that, the City had not established a differential rate for in- and out-of-City sewer users; rather, the prior City ordinance—Ordinance 994—had set one rate for in-City users and provided that out-of-City users' rates were set by contract.  (*See* Sterbank Decl. ¶ 2, Ex. B ("Ord. 994") § 1.C; Ord. 1133 §§ 1-2.)[3]  The Agreement ties the rate for sewer

---

[2] An ERU is the equivalent of up to 180 gallons of wastewater per day and one-half pound of biochemical oxygen demand ("BOD") per day.  (Am. Compl. ¶ 37.)

[3] Ordinance 994 did, however, have differential rates for in-City and out-of-City water users.  (*See* Ord. 994 § 3.)  The court takes judicial notice of Ordinance 1133 and Ordinance 994.

ORDER- 3

services to the legislatively enacted rate. (Agreement ¶ 2.6.6 ("The rate for waste water treatment shall be the then-current rate at any time established by the City Council for sewer service . . . .").) The City's decision to create a different rate for customers outside City limits caused the sewer rates for the Casino and other out-of-City users to go up by 50 percent. (*See id.* ¶¶ 49, 51.) The Tribe alleges the Casino is one of only a few businesses located outside City limits that are using the City's sewer system. (*Id.* ¶ 51; *see also id.* ¶ 50 ("On information and belief, the City targeted its rate increase . . . with the intent of eliciting additional money from only the Tribe.").)

"Beginning in 2013, the City and the Tribe began discussions about amending the Agreement." (*Id.* ¶ 55.)[4] By 2015, "both the Tribe and the City indicated concerns with the status quo Agreement." (*Id.* ¶ 56.) The Agreement was to reach the end of its first term in November 2015, and in July 2015, the City and the Tribe met to discuss amending the Agreement before that time. (*Id.*) At that meeting, the Tribe expressed its desire for a one-year extension to allow the parties time to negotiate a long-term solution. (*Id.*) "The City expressed a desire to amend provisions of the Agreement pertaining to allocation of impact mitigation fund dollars under the Compact with the State." (*Id.*) In an August 25, 2015, letter, the City threatened to cease providing services to the Casino

---

*See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) (citing *Newcomb v. Brennan*, 558 F.3d 668, 689 (7th Cir. 1977)) (stating that city ordinances are "proper subjects for judicial notice"). The Tribe argues that the court should not consider these ordinances but does not dispute their accuracy or authenticity. (*See* Resp. at 26-28.)

[4] The Agreement had been amended once already, "on January 28, 2008; however, the amendment did not change any provision related to sewer services." (Am. Compl. ¶ 42.)

upon expiration of the Agreement. (*Id.* ¶ 57.) The Tribe and City corresponded about the Tribe's proposed extension and the City's desired changes in September and early October. (*See id.* ¶¶ 58-60.) On October 15, 2015, the City signed the Tribe's proposed amendment, which renewed the Agreement for one year. (*Id.* ¶ 61.)

Accompanying the City's October 15, 2015, acceptance was a letter from Mayor Larson informing the Tribe that the City Council had voted to discontinue sewer services to the Tribe by November 30, 2016. (*See id.* ¶¶ 61-63.) The letter explained that two City Council members had voted to terminate the Agreement immediately but that the Council had approved the one-year extension to allow for an orderly transition to other services. (*See id.* ¶ 63.)[5] The City also informed the Tribe that it would oppose any extension of other utility services outside or across established municipal UGA boundaries, though the Tribe concedes that state law and the King County Code would not allow such an extension in any case. (*See id.* ¶¶ 66-67.) Further, the City has opposed the Tribe taking land into trust for the construction of sewer and water facilities. (*See id.* ¶¶ 68-70.)

The Tribe alleges that the City has likewise interfered with its efforts to obtain replacement fire and emergency medical services. The City will cease providing those services to the Tribe if the City terminates the Agreement. (*Id.* ¶ 75.) Accordingly, the Tribe has explored obtaining those services from another provider—Eastside Fire &

---

[5] In a November 2, 2015, letter, the City informed the Bureau of Indian Affairs that the City "no longer wishes to be in a business relationship with the Tribe." (Am. Compl. ¶ 64 (internal quotation marks omitted).)

ORDER- 5

Rescue ("EF&R").  (*See id.* ¶ 77.)  The City, however, has told EF&R that the Agreement does not permit an alternative arrangement and has submitted a public records request to EF&R regarding EF&R's communications with the Tribe.  (*See id.* ¶¶ 78-79.)  The Tribe alleges that these actions may increase the cost of fire and emergency medical services as the Tribe must indemnify EF&R in the event the City sues EF&R regarding its agreement with the Tribe.  (*Id.* ¶ 80.)

The Tribe contends that the City has undertaken these actions out of racial animus.  In support of that contention, the Tribe alleges that "Defendants' decision to refuse services to the Plaintiff denies Plaintiff a basic utility service that the City holds out and offers to non-Indians within the City of Snoqualmie and within its UGA."  (*Id.* ¶ 87.)  The Tribe also alleges that the City "is overcharging the Tribe for sewer services," and that "the City has not terminated or threatened termination of sewer utility service of any other paying customer within City limits and the City's UGA."  (*Id.* ¶¶ 88-89.)

The Tribe filed this lawsuit on December 9, 2015.  (Compl. (Dkt. # 1) at 1.)  On December 22, 2015, the Tribe filed an amended complaint, which is the presently operative complaint.  (Am. Compl. at 1.)  In the amended complaint, the Tribe asserts causes of action for racial discrimination in violation of 42 U.S.C. § 1981 (*id.* ¶¶ 81-96), unreasonable refusal to provide sewer services in violation of RCW 35.67.31 (*id.* ¶¶ 97-105), and tortious interference with contractual relations and business expectancies (*id.* ¶¶ 106-16).

//

//

Defendants move to dismiss the Tribe's Section 1981 claim on the basis that the Tribe has alleged insufficient facts to support that claim.[6] (*See* Mot. at 14-22.) Although Defendants move for dismissal under Federal Rule of Civil Procedure 12(b)(6) (*see id.* at 1), they have already filed an answer to the Tribe's amended complaint (Ans. (Dkt. # 18)), and the Tribe has filed an answer to Defendants' counterclaims (Ans. to Counterclaims (Dkt. # 19)). Accordingly, the court treats Defendants' motion as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *See Aldabe v. Aldabe*, 616 F.2d 1089, 1093 (9th Cir. 1980). Defendants' motion is now before the court.

### III.   DISCUSSION

**A.   Legal Standard**

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed. *See* Fed. R. Civ. P. 12(c). A court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citation omitted); *see also Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 925 (9th Cir. 2011) (explaining that the court "assume[s] the facts alleged in the complaint are true"). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment

---

[6] Defendants also argue that once the court has dismissed the Tribe's Section 1981 claim, the court should decline to exercise supplemental jurisdiction over the Tribe's remaining state law claims and dismiss those claims as well. (*See* Mot. at 22-23.)

as a matter of law." *Id.*; *see Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011).

When a Rule 12(c) motion is used as a vehicle for a Rule 12(b)(6) motion after an answer has been filed, or when it is functionally equivalent to a motion to dismiss for failure to state a claim, the same standard applies to both. *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *see Seabright Ins. Co. v. Matson Terminals, Inc.*, 828 F. Supp. 2d 1177, 1188 (D. Haw. 2011) (observing that the motions differ in time of filing but are otherwise functionally identical and require the same standard of review). Dismissal for failure to state a claim "is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court, however, need not accept as true a legal conclusion presented as a factual allegation. *Id.* Although the pleading standard announced by Federal Rule of Civil Procedure 8 does not require "detailed factual allegations," it demands more than "an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). A pleading that offers only "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss. *Id.*

On a Rule 12(c) motion, the court is not strictly limited to considering the face of the complaint. Just like on a Rule 12(b)(6) motion, the court may consider material that is properly submitted as part of the complaint without converting the motion into a summary judgment motion. *Point Ruston, LLC v. Pac. Nw. Reg'l Council of the United Bhd. of Carpenters & Joiners of Am.*, 658 F. Supp. 2d 1266, 1273 (W.D. Wash. 2009) (citing *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001)). Even if the documents are not physically attached to the complaint, the court may consider them if their authenticity is not contested and the complaint necessarily relies on them. *Id.* at 1273-74 (citing *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994)). Moreover, the court may take judicial notice of "matters of public record" pursuant to Federal Rule of Evidence 201 without converting the motion into a summary judgment motion. *Id.* (citing *Mack v. S. Bay Beer Distrib., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)). The court may not, however, take judicial notice of a fact that is subject to reasonable dispute. Fed. R. Evid. 201(b). In addition, Federal Rule of Civil Procedure 12(d) provides that "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent" to a motion for judgment on the pleadings. *See Point Ruston*, 658 F. Supp. 2d at 1274.[7]

---

[7] The parties dispute whether the court can consider multiple documents that Defendants submitted with their motion. (*See* Resp. at 26-28; Reply at 11-12.) In ruling on Defendants' motion, the court considers only those documents cited in this order. The court expresses no

**B.     Analysis**

Defendants move to dismiss the Tribe's 42 U.S.C. § 1981 claim for failure to state a claim. (*See* Mot. at 1-2.) Section 1981 prohibits racial discrimination in the making and enforcement of private contracts. *See* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."); *see also id.* § 1981(b) ("[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."); *id.* § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."). Only purposeful discrimination violates Section 1981. *Gen. Bldg. Contractor's Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982). Thus, where a plaintiff brings a Section 1981 claim based on the denial of services, the plaintiff must plead facts supporting a reasonable inference that the defendant denied the plaintiff the right to contract for services because of the plaintiff's race. *See Lindsey v. SLT L.A., LLC*, 447 F.3d 1138, 1144-45, 1147 (9th Cir. 2005); *Portfolio Invs., LLC v. First Sav. Bank*, No. C12-104 RAJ, 2013 WL 1187622, at *5-6 (W.D. Wash. Mar. 20, 2013); *see also Iqbal*, 556 U.S. at

---

opinion on the merits of the parties' positions regarding any disputed documents not cited in this order. The court denies the Tribe's request to convert Defendants' motion to a motion for summary judgment. (*See* Resp. at 26-28.)

678. Defendants argue that the Tribe has not plausibly pleaded discriminatory intent. (*See* Mot. at 14-22.)

Plaintiffs in discrimination cases may plausibly plead discriminatory intent in several ways. For instance, plaintiffs commonly allege that a similarly situated individual or entity outside of the plaintiff's protected group received more favorable treatment from the defendant. *See, e.g.*, *Fielder v. Sterling Park Homeowner's Ass'n*, 914 F. Supp. 2d 1222, 1228-29 (W.D. Wash. 2012); *Portfolio Invs.*, 2013 WL 1187622, at *5-6. When the plaintiff takes this route, however, it must plead sufficient detail about the proposed comparator so that the court can reasonably infer that racial animus accounts for the difference in treatment.[8] *See Portfolio Invs.*, 2013 WL 1187622, at *5-6 (citing *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) and *Blair v. Alaskan Copper & Brass Co.*, No. C07-1877RAJ, 2009 WL 2029963, at *7 (W.D. Wash. July 10, 2009)) ("The comparator must be similar in 'all material respects.' This is a stringent test."); *see also Scocca v. Smith*, No. C-11-1318 EMC, 2012 WL 2375203, at *5 (N.D. Cal. June 22, 2012) ("[T]he fact that [the plaintiff] and the favored third parties were all applicants for licenses is not enough to give rise to an inference that they are similarly situated.").

//

//

---

[8] Defendants argue that after *Iqbal*, plaintiffs may not rely on circumstantial evidence to show discriminatory intent at the pleadings stage. (*See* Reply at 5.) The court disagrees. *Iqbal* requires plaintiffs to plead facts from which the court can reasonably infer discriminatory intent; it does not require plaintiffs to plead facts that, if proved, would amount to direct evidence of discriminatory intent. *See* 556 U.S. at 678-79.

The Tribe fails to plead facts from which the court can reasonably infer purposeful racial discrimination. *See Iqbal*, 556 U.S. at 676-78.[9] The Tribe alleges, "[o]n information and belief," that "the City has not terminated or threatened termination of sewer utility service of any other paying customer within City limits and the City's UGA." (Am. Compl. ¶ 89.) This comparator allegation is inadequate because it provides insufficient detail for the court to reasonably infer that purposeful racial discrimination accounts for the alleged differential treatment. *See Portfolio Invs.*, 2013 WL 1187622, at *5-6; *see also Francis v. Giacomelli*, 588 F.3d 186, 195-96 (4th Cir. 2009) (describing African American plaintiff's allegation that "defendants have never initiated or undertaken the actions of terminating employment and physically removing [white] employee[s]" as "conclusory and insufficient" and "nothing more than the sort of unadorned allegations of wrongdoing to which *Twombly* and *Iqbal* are directed" in ruling that plaintiff failed to "state a plausible claim for relief" under Section 1981).

The amended complaint indicates that the Casino is outside City limits and requires considerable wastewater treatment capacity. (*See* Am. Compl. ¶¶ 2, 37, 51-54; *see also* Agreement ¶ 2.6.) The amended complaint also indicates that the Tribe and the City have a multi-faceted agreement for a range of municipal services, had concerns about "the status quo Agreement" in 2015, and disagreed over the content of a further amendment to the Agreement. (*See* Am. Compl. ¶¶ 32, 43, 55-56, 58-60, 75; *see also*

---

[9] Many of the Tribe's allegations are conclusory. (*See, e.g.*, Am. Compl. ¶ 71 ("The City is trying to choke out the Tribe on the basis of race.").) Those allegations are not entitled to a presumption of truth, and the court does not consider them in deciding whether the Tribe has plausibly pleaded discriminatory intent. *See Iqbal*, 556 U.S. at 678.

Agreement.)  Accordingly, the broad, undifferentiated category "other paying customers" lacks sufficient specificity and is not a comparator that is similarly situated to the Tribe or the Casino in all material respects.  *See Portfolio Invs.*, 2013 WL 1187622, at *5-6; *see also Francis*, 588 F.3d at 195-96.  The allegation that the City has not threatened "other paying customers" with termination of sewer services thus fails to support a reasonable inference the City purposefully discriminated against the Tribe on the basis of race.  *See Iqbal*, 556 U.S. at 678.

The Tribe also attempts to demonstrate discriminatory intent using the factors described in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-67 (1977), as relevant to showing an equal protection violation.  (*See* Resp. at 18-23.)[10]  The first such factor is whether the "impact of the official action . . . bears more heavily on one race than another."  *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  Here, the Tribe points to Ordinance 1133, which raised the sewer rates for out-of-City customers as of 2014.  (*See* Resp. at 19.)  The Tribe asserts that it is one of only a few out-of-City customers and

---

[10] Defendants object to the Tribe's reliance on the *Arlington Heights* factors because equal protection claims require plaintiffs to demonstrate only that race was a motivating factor in the challenged decision.  (*See* Reply at 5-8.)  Defendants argue that the standard for Section 1981 claims—intentional racial discrimination—is different and thus the *Arlington Heights* factors are inapplicable.  (*See id.*)  The court nevertheless considers the Tribe's arguments.  The *Arlington Heights* Court identified types of evidence that may help determine "whether invidious discriminatory purpose was a motivating factor."  429 U.S. at 265-68.  Even if the standards for equal protection and Section 1981 claims do not overlap perfectly, the types of evidence identified in *Arlington Heights* may still be relevant to determining whether a Section 1981 defendant has engaged in intentional racial discrimination.  *See id.* at 265 ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."), 268 ("The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed.").

therefore this factor shows discriminatory intent. (*See id.* (citing Am. Compl. ¶ 51).) The court disagrees. To begin, the Tribe is challenging the City's 2015 decision to terminate services, not the City's 2014 rate increase. (*See* Am. Compl. ¶¶ 81-96.) Moreover, disparate impact alone cannot show intentional discrimination absent a "stark" and "clear" pattern, "unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266. No such pattern is alleged here.

The next *Arlington Heights* factors are "the historical background of the decision," and the "specific sequence of events leading up to the challenged decision." *Id.* at 267. The Tribe argues that this factor supports an inference of discriminatory intent in light of the "escalation of events in the year of 2015." (Resp. at 20.) The factual allegations in the amended complaint show a deteriorating relationship between the parties to the Agreement; however, the background and sequence of events alleged do not support a reasonable inference of racial animus.[11] *Cf. Arlington Heights*, 429 U.S. at 267 (offering

---

[11] In its responsive memorandum, the Tribe states that the City quickly changed its tenor in negotiations and threatened to terminate sewer service only four days after learning of the Tribe's application to take land into trust ("fee-to-trust application"). (Resp. at 21.) The Tribe argues that this sequence of events shows the racial animus behind the City's actions. (*See id.*) The court rejects this argument. First, the amended complaint contains no allegations regarding when the City learned of the Tribe's fee-to-trust application. (*See* Am. Compl.) Second, even if the amended complaint contained such allegations, that sequence does not plausibly show racial animus. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"). The Tribe invites the court to assume that the mere fact of opposition to a fee-to-trust application by a non-Native American indicates racial animus. (*See* Resp. at 21.) The court declines that invitation. Furthermore, the court notes that the Tribe's only support for such an assumption is an article written two years ago by a partner at the law firm representing the Tribe in this matter. (*See* Resp. at 21 (citing David C. Smith, *Defending Indian Lands After* Carcieri, 2014 WL 2326354, at *9 (Thompson Reuters/Aspatore 2014)).)

as an example a situation in which the defendant-city cancels or alters planned development shortly after learning that its plans would have brought racial minorities into the city).

The fourth *Arlington Heights* factor is "[d]epartures from the normal procedural sequence," and the fifth is "[s]ubstantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.* The tribe argues these factors are implicated here based on Ordinance 1133, which the Tribe characterizes as a unilateral amendment to the Agreement and a "departure from typical procedure among contracting parties," and the City's decision to notify the BIA that the City no longer wanted to do business with the Tribe. (*See* Resp. at 22.) The Tribe does not allege enough facts to show that either of these actions constitutes a "departure" from which the court could reasonably infer racial animus.[12]

In sum, the Tribe's allegations fail to support a reasonable inference that Defendants have intentionally discriminated against the Tribe on the basis of race. *See Iqbal*, 556 U.S. at 676-78; *Lindsey*, 447 F.3d at 1144-45. The Tribe plausibly pleads that the City has taken a tough negotiating stance with the Tribe. (*See* Am. Compl.) Nevertheless, absent well-pleaded factual allegations of more favorable treatment for similarly situated entities or other circumstances suggesting racial animus, the court cannot reasonably infer that the City is intentionally discriminating against the Tribe on

---

[12] The Tribe alleges nothing implicating the final *Arlington Heights* factor: contemporary statements by members of the decision-making body. 429 U.S. at 268; (*see* Resp. at 23 n.4; Am. Compl.)

the basis of race. The court therefore grants Defendants' motion to dismiss the Tribe's Section 1981 claim.

**C.     Leave to Amend**

As a general rule, when a court grants a motion to dismiss, the court should dismiss the complaint with leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (citing Fed. R. Civ. P. 15(a)). The policy favoring amendment is to be applied with "extreme liberality." *Id.* at 1051. In determining whether dismissal without leave to amend is appropriate, courts consider such factors as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Leave to amend is appropriate here. Though the Tribe has not stated a plausible Section 1981 claim in its amended complaint, the court cannot say on the record before it that leave to amend would be futile or that any other relevant factors weigh against granting leave to amend. Furthermore, Defendants make no argument concerning leave to amend. (*See* Mot.; Reply.) The court therefore grants the Tribe leave to amend its complaint to cure the deficiencies in the Tribe's Section 1981 claim. If the Tribe chooses to amend its complaint, it must do so no later than 20 days from the date of this order. If the Tribe fails to file an amended complaint within that timeframe, the court will dismiss the Tribe's Section 1981 claim without leave to amend.

Because the court grants the Tribe leave to amend its federal claim, the court denies Defendants' request that the court decline supplemental jurisdiction over the Tribe's state law claims. (*See* Mot. at 22-23.) Such denial is without prejudice to Defendants again raising the issue of supplemental jurisdiction at a later time as appropriate.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' motion (Dkt. # 22). The court DISMISSES the Tribe's Section 1981 claim but GRANTS the Tribe leave to amend its complaint concerning that claim within 20 days of the date of this order. The Court DENIES without prejudice Defendants' request that the court decline supplemental jurisdiction over and dismiss the Tribe's state law claims.

Dated this 16th day of May, 2016.

JAMES L. ROBART
United States District Judge

ORDER- 17